T.C. Memo. 1998-426

UNITED STATES TAX COURT

THOMAS H. SCOTT AND LYNN D. SCOTT, TRANSFEREES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5245-95.                    Filed November 30, 1998.

<u>Thomas G. Hodel</u>, for petitioners.

<u>William R. Davis, Jr.</u> and <u>Jerry L. Leonard</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  In separate notices of transferee liability
(notices), respondent determined that petitioner Thomas H. Scott
(Mr. Scott) and petitioner Lynn D. Scott (Ms. Scott) are liable
as transferees of Mountain States Stock Transfer Agents, Inc.
(MSSTA) (1) in amounts not exceeding $104,580 and $95,072, re-

spectively, for MSSTA's unpaid Federal income tax (tax) liability for 1989 of $164,981 (MSSTA's unpaid tax liability) and (2) for "interest as provided by law".[1]

We must decide whether Mr. Scott and Ms. Scott (collectively, the Scotts) are liable as transferees of MSSTA in amounts not exceeding $104,580 and $95,072, respectively, for MSSTA's unpaid tax liability and, if so, whether they are liable for interest on such respective amounts from March 15, 1990, the date on which MSSTA's unpaid tax liability became due, to January 10, 1995, the date on which the notices were issued.[2]  We hold that Mr. Scott is so liable and that Ms. Scott is not.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found unless otherwise stated herein.

At the time the petition was filed, petitioners resided in Denver, Colorado.

On October 2, 1980, MSSTA was incorporated under the laws of the State of Colorado.  From its incorporation until September

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]  The parties agree that in the event the Court were to determine that either petitioner is liable as a transferee of MSSTA, each such petitioner also would be liable under secs. 6601 and 6621 for interest from Jan. 10, 1995, to the date on which the amount of each such petitioner's liability is paid.

14, 1989, James R. Carter (Mr. Carter) owned 52 percent, and each of the Scotts owned 24 percent, of the stock of MSSTA, and Mr. Carter and Mr. Scott were directors and officers of that company, Mr. Scott having served as its president. At all relevant times prior to September 14, 1989, Mr. Carter's son, Rock Carter, also was a director of MSSTA.

At all relevant times, MSSTA was in the business of acting as a securities transfer agent (securities transfer agent business), principally for corporations whose stock was traded on the over-the-counter market in Denver, Colorado. MSSTA's primary competitor during the mid-to-late 1980's was American Securities Transfer, Inc. (AST).[3] Throughout that period, AST was wholly owned by Charles R. Harrison (Mr. Harrison), its president who was in charge of operational and marketing matters, and Bruce E. Hall (Mr. Hall), its treasurer and secretary who was in charge of financial, accounting, and tax matters. At all relevant times, Mr. Hall, a certified public accountant (C.P.A.), also engaged in a small individual tax practice.

Prior to 1989, MSSTA's business had been very profitable. Based on his assessment of the securities transfer agent industry, Mr. Scott determined around early 1989 that the level of profits which MSSTA had enjoyed over the prior several years

---

[3] Sometime during 1996, AST's name was changed to American Securities Transfer and Trust, Inc.

would not continue. Mr. Scott and Mr. Carter met sometime during the first several months of 1989 to discuss MSSTA's financial situation. Mr. Scott wanted to remain involved as an officer and an owner of MSSTA's securities transfer agent business, whereas Mr. Carter desired to withdraw his investment in that business and use it for other purposes. Mr. Scott and Mr. Carter decided to attempt to merge MSSTA with another company in the securities transfer agent business or to sell MSSTA's assets to such a company and then liquidate MSSTA. Mr. Carter suggested to Mr. Scott that he approach AST to explore a possible combination of MSSTA and AST. Mr. Scott contacted Mr. Harrison sometime around the spring of 1989, and they held preliminary discussions relating to that possibility.

Around May 1989, Mr. Scott met (May 1989 meeting) with Stephen Hrynik (Mr. Hrynik) who had been serving for about six or seven years as MSSTA's outside accountant, auditor, and tax return preparer. Mr. Hrynik, a C.P.A. since 1976, had first met Mr. Scott in the mid-1970's when Mr. Hrynik was employed by another C.P.A. who was representing Mr. Scott and Mr. Scott's business on accounting and tax matters, and Mr. Hrynik was assigned to work on certain of those matters. At the May 1989 meeting, Mr. Scott informed Mr. Hrynik about the discussions that he was having regarding the possibility of combining MSSTA and AST. Mr. Hrynik advised Mr. Scott at that meeting about the

differences between a merger and an asset sale. Mr. Scott did not give Mr. Hrynik any documents relating to a possible combination of MSSTA and AST at the May 1989 meeting.

During the discussions between Mr. Scott and Mr. Harrison about combining the businesses of MSSTA and AST, Mr. Scott was acting on behalf of MSSTA, Mr. Carter, Ms. Scott, and himself, and Mr. Harrison was acting on behalf of AST, Mr. Hall, and himself. During those discussions, it was determined that any combination of MSSTA and AST would have to be structured as an asset acquisition, and not a merger, so that the acquiring company in any such combination would not be responsible for the liabilities of the acquired company. Mr. Scott informed Mr. Harrison that, regardless how the combination of MSSTA and AST was structured, Mr. Scott and Ms. Scott, but not Mr. Carter, wanted to remain as stockholders of the combined businesses, and Mr. Scott, but not Mr. Carter, desired to remain as an officer thereof.

As a result of negotiations between Mr. Scott and Mr. Harrison, MSSTA and AST agreed in principle that MSSTA would sell its assets to AST; Mr. Scott and Ms. Scott, but not Mr. Carter, would acquire stock of AST; Mr. Scott would become president of AST; and AST would enter into consulting agreements with Mr. Scott and Mr. Carter, respectively. Thereafter, Mr. Hall began meeting with Mr. Scott and Mr. Harrison in order to negotiate the

specific terms of the foregoing agreement in principle. In order to assist them in those negotiations in determining, inter alia, the value of the respective assets of AST and MSSTA and the total number of shares of AST stock that the Scotts would be able to acquire as part of the transaction in which AST purchased MSSTA's assets, AST directed Ed Schultz (Mr. Schultz), AST's outside C.P.A., to prepare business valuations of AST and MSSTA. Although not a business valuation expert, Mr. Hrynik, as MSSTA's outside accountant and auditor, met twice with Mr. Schultz regarding Mr. Schultz' assignment.

Based principally on Mr. Schultz' business valuations of AST and MSSTA and Mr. Carter's decision not to acquire stock of AST as part of the transaction in which AST purchased MSSTA's assets, Mr. Harrison and Mr. Hall informed Mr. Scott, inter alia, that AST was willing to buy MSSTA's assets for approximately $800,000 and that, as part of that transaction, the Scotts would be permitted to purchase for approximately $300,000 a total of about 33 percent of AST's stock. Mr. Scott, Mr. Carter, and MSSTA tentatively agreed to the foregoing terms proposed by Mr. Harrison, Mr. Hall, and AST. They also tentatively agreed with Mr. Harrison, Mr. Hall, and AST that (1) AST would pay (a) $600,000 of the $800,000 purchase price for MSSTA's assets directly to MSSTA and (b) the $200,000 balance, as well as an additional negotiated amount, directly to Mr. Carter under an agreement by

Mr. Carter to consult and not to compete with AST; (2) MSSTA would make liquidating distributions to the Scotts and Mr. Carter, based on their respective stock ownership of MSSTA, of the $600,000 that it would receive directly from AST; and (3) the Scotts would use money that they would receive from MSSTA in such liquidating distributions to assist them in purchasing stock in AST.

Mr. Harrison and/or Mr. Hall directed AST's attorney, Gary LaPlante (Mr. LaPlante), to prepare preliminary drafts of the various documents that would be needed to implement the tentative agreements that had been reached regarding, inter alia, MSSTA's sale of its assets to AST, the Scotts' respective purchases of stock of AST, and consulting agreements between AST and Mr. Scott and Mr. Carter, respectively. (We shall sometimes refer to MSSTA's sale of its assets to AST and all of the transactions that occurred simultaneously with that sale as the MSSTA transaction.)

Mr. Scott retained Arthur Bosworth (Mr. Bosworth), an attorney, to represent MSSTA and the Scotts in the MSSTA transaction. Mr. Bosworth had previously represented them with respect to various litigation matters. Mr. Bosworth initially declined to represent MSSTA and the Scotts in the MSSTA transaction because he was not competent to give tax advice. However, Mr. Bosworth agreed to represent them after Mr. Scott told him

that he had retained Mr. Hrynik for assistance on tax and accounting matters relating to the MSSTA transaction. Mr. Bosworth informed Mr. Harrison, Mr. Hall, and AST's attorney, as well as Mr. Scott, but not Ms. Scott, that he was not representing MSSTA and the Scotts with respect to any tax matters.

Around the end of August 1989, Mr. Scott asked Mr. Hall what the tax consequences would be to MSSTA and the Scotts under the tentative agreements that had been reached regarding the MSSTA transaction. Mr. Hall responded that (1) MSSTA's tax liability would be approximately $100,000 if it reported the $600,000 that AST had tentatively agreed to transfer directly to it as the amount realized from the sale of its assets; (2) there would be no tax consequence to MSSTA as a result of AST's payment directly to Mr. Carter of $200,000 of the total $800,000 that AST was willing to pay for MSSTA's assets; and (3) based on the tax law relating to capital gains, the Scotts would owe tax on the capital gains that they would realize when MSSTA made liquidating distributions to them as 48-percent stockholders of MSSTA of approximately $300,000, which tax would be equal to about one-third of such gains. Because of that capital gains tax that the Scotts would owe, they would not have sufficient cash from the MSSTA transaction to purchase the entire 33-percent stock interest in AST which they wanted to acquire and to which Mr. Harrison, Mr. Hall, and AST had tentatively agreed, and they

would have to make other arrangements to buy that stock interest, such as guaranteeing the loan that AST would have to obtain in order to finance in part its purchase of MSSTA's assets. Mr. Hall cautioned Mr. Scott to consult his own tax adviser about the tax consequences to MSSTA and the Scotts as a result of the MSSTA transaction, since Mr. Hall was not familiar with either MSSTA's or the Scotts' tax situation.

Mr. Scott told Mr. Hall that he did not intend to pay any taxes as a result of the MSSTA transaction. In an attempt to accommodate Mr. Scott, Mr. Harrison and Mr. Hall told Mr. Scott that the form of the MSSTA transaction could be changed to the following: AST would transfer directly to MSSTA $300,000, instead of $600,000, for MSSTA's assets; Mr. Carter would receive that $300,000 from MSSTA in redemption of his MSSTA stock; and each of the Scotts would acquire (1) a 10.5-percent stock interest in AST for a nominal cash amount and (2) an additional 6-percent stock interest in that company in exchange for a nominal cash amount and Mr. Scott's promise to guarantee a bank loan that AST would seek in order to finance in part its acquisition of MSSTA's assets and to forgo for a period of several years contributions by AST for Mr. Scott's benefit to its profit-sharing plan. Mr. Hall indicated to Mr. Scott that, under the foregoing form of the MSSTA transaction, MSSTA and the Scotts could take the following return positions: (1) MSSTA would report the

$300,000 that it received directly from AST as the amount realized from the sale of MSSTA's assets, and (2) the Scotts would not report any income because there would be no liquidating distributions to them by MSSTA. Mr. Hall further advised Mr. Scott that, provided that the foregoing return positions were accepted by the Internal Revenue Service (Service), (1) MSSTA's tax liability would be approximately $10,000, and (2) the Scotts would not owe any tax. Mr. Hall cautioned Mr. Scott that the Service could decide not to accept those return positions of MSSTA and the Scotts because the Scotts would be paying only a nominal cash amount for a 21-percent stock interest in AST and would not be reporting any income attributable to liquidating distributions by MSSTA to them. Nonetheless, Mr. Scott, acting on behalf of MSSTA, Ms. Scott, Mr. Carter, and himself, and Mr. Harrison and Mr. Hall, acting on behalf of AST and themselves, decided to take that tax risk and agreed, inter alia, on the following form of the MSSTA transaction: AST would transfer only $300,000 directly to MSSTA for its assets; Mr. Carter would receive that amount from MSSTA in redemption of his MSSTA stock; and the Scotts would pay AST only a nominal cash amount to acquire a 21-percent stock interest in that company.

Sometime after Mr. LaPlante prepared the preliminary drafts of the various documents that would be needed to implement the tentative agreements that had been reached, Mr. Scott contacted

Mr. Hrynik, whom Mr. Scott had not consulted since Mr. Scott had asked him to meet with Mr. Schultz, and asked him to review several draft documents relating to that transaction including, inter alia, the following: (1) An asset purchase agreement pursuant to which AST would acquire MSSTA's assets; (2) a stock redemption agreement pursuant to which MSSTA would redeem Mr. Carter's entire stock interest in MSSTA for $300,000; (3) an agreement between AST and Mr. Carter pursuant to which he would agree to consult and not to compete with AST; and (4) separate agreements between AST and Mr. Scott and Ms. Scott, respectively, pursuant to which each of them would purchase certain stock of AST. (We shall refer collectively to the draft documents that Mr. Hrynik received from Mr. Scott as the MSSTA transaction draft documents.) At the time Mr. Scott asked Mr. Hrynik to review the MSSTA transaction draft documents, Mr. Hrynik did not know, inter alia, that AST was willing to pay approximately $800,000, instead of $300,000, to acquire MSSTA's assets. Nor was he aware of the discussions that had taken place among Mr. Scott, Mr. Harrison, and Mr. Hall regarding the amount of MSSTA's tax liability if AST transferred to MSSTA, and MSSTA reported, $600,000 as the sales price for MSSTA's assets.

After he reviewed the MSSTA transaction draft documents, Mr. Hrynik told Mr. Scott that certain of those documents were incomplete, including, inter alia, the MSSTA transaction draft

documents relating to the purchase by Mr. Scott and Ms. Scott, respectively, of certain stock of AST, which did not reflect the price for each such purchase.  In response, Mr. Scott advised Mr. Hrynik that Mr. Scott would take responsibility for negotiating that purchase price with AST.

Mr. Hrynik's review of the MSSTA transaction draft documents led him to inform Mr. Scott that, because the transactions reflected in those documents were to take place simultaneously and in no particular order, the Service might consider them to be one transaction for tax purposes.  In response, Mr. Scott told Mr. Hrynik not to spend very much time reviewing the tax consequences of the MSSTA transaction because Mr. Scott had consulted with AST's accountants and Mr. Scott believed that he understood the tax consequences of that transaction.

On September 7, 1989, MSSTA and AST entered into an "AGREEMENT FOR PURCHASE AND SALE OF ASSETS" (asset purchase agreement) which stated that MSSTA would, inter alia, sell its assets to AST for $300,000.  On or about the same date, Mr. Scott, Mr. Carter, Mr. Harrison, Mr. Hall, MSSTA, and AST agreed that MSSTA would retain 45 customer accounts that were known as S accounts (S accounts).  Mr. Scott estimated that the retention of those accounts by MSSTA would generate approximately $10,000 a month in revenues, the approximate amount that was needed each month in order for MSSTA to meet its existing lease obligation

(lease obligation) for which Mr. Scott also was personally liable, as well as its expenses in maintaining the S accounts.

On September 7, 1989, MSSTA and Mr. Carter entered into a "STOCK REDEMPTION AGREEMENT" (stock redemption agreement) with MSSTA in which Mr. Carter agreed to "sell, convey, transfer, assign, and deliver to" MSSTA all of the common stock that he owned in that company, in return for which MSSTA agreed to pay him $300,000. Mr. Scott signed the stock redemption agreement as president of MSSTA.

On September 14, 1989 (closing date), MSSTA and AST entered into an "AMENDMENT TO AGREEMENT FOR PURCHASE AND SALE OF ASSETS" (amendment to the asset purchase agreement), which reflected MSSTA's retention of 45 S accounts. MSSTA and AST also entered into an "OPTION AGREEMENT" (option agreement), dated September 14, 1989, which gave AST an option until December 31, 1991, to buy those S accounts from MSSTA for $500 per account. Despite MSSTA's retention of the S accounts, the purchase price of $300,000 for MSSTA's assets that was reflected in the asset purchase agreement was not altered by the amendment to the asset purchase agreement. (We shall refer collectively to the asset purchase agreement and the amendment to the asset purchase agreement as the amended asset purchase agreement.)

On September 8, 1989, Mr. Bosworth wrote a letter to Mr. Hrynik (Bosworth letter) that was signed by his associate. The

Bosworth letter indicated that the purchase price for the assets of MSSTA except the S accounts (MSSTA's non-S account assets) was $300,000. That letter listed MSSTA's non-S account assets and allocated that $300,000 purchase price among those assets. The Bosworth letter also stated in pertinent part:

> The foregoing allocation of the [$300,000] purchase price for the assets will be utilized in reporting this transaction to any and all taxing authorities. * * *.

> Both in house and outside C.P.A.'s for AST have assured MSSTA this allocation results in the least possible taxable event to MSSTA, and that tax liability will not exceed $10,000 in connection with the allocation.

> This letter is to request that you review the allocation [of the $300,000 purchase price], and contact this firm regarding whether you agree with AST's representation that the maximum tax liability faced by MSSTA is $10,000.

> The closing of this sales transaction is scheduled for Wednesday morning, September 13, 1989. I would greatly appreciate it if you could contact Arthur Bosworth, * * * with respect to your opinion concerning the allocation, as well as your opinion letter relative to the solvency of MSSTA subsequent to the asset sale. * * *.

Shortly after receiving the Bosworth letter, Mr. Hrynik telephoned Mr. Bosworth and advised him that, based on the representations in the Bosworth letter that the purchase price for MSSTA's non-S account assets was $300,000 and that, in reporting the MSSTA transaction to all tax authorities, MSSTA would reflect that amount as the purchase price for those assets, MSSTA's tax liability would be around $10,000 or less. Mr. Hrynik did not

consider his opinion about MSSTA's tax liability to constitute his opinion as to whether the $300,000 purchase price, as set forth in the Bosworth letter, would be sustained if MSSTA's return were audited by the Service.

As requested in the Bosworth letter, Mr. Hrynik also prepared a letter (solvency letter), dated September 13, 1989, which he sent to the board of directors and stockholders of MSSTA. The solvency letter stated:

> We have been requested to provide our opinion relative to the solvency of the Company [MSSTA] subsequent to the Company's sale of assets to American Securities Transfer, Inc. and the redemption of James R. Carter's common stock.
>
> Section 7-6-102 of the Colorado Corporation Code provides that no redemption or purchase of redeemable stock shall be made by a corporation when it is insolvent or when such redemption or purchase would render it insolvent and further provides that a corporation may redeem its stock only out of surplus. Section 7-1-102 of the Code defines insolvency as the inability of a corporation to pay its debts as they become due in the usual course of its business.
>
> In our opinion, based on the Company's unaudited balance sheet at August 31, 1989, there will be, immediately after the asset sale, adequate unreserved and unrestricted surplus to purchase Mr. Carter's stock. Further, subsequent to the stock redemption and based on management's statement that the Company [MSSTA] will continue to operate in a limited capacity and generate approximately $10,000 per month in gross revenue, the Company will have the ability to pay its debts as they become due in the usual course of business.

At the request of Mr. LaPlante, the only transactions that were part of the MSSTA transaction which Mr. Hrynik considered in opining on the solvency of MSSTA are those described in the first

paragraph of the solvency letter quoted above. In considering those transactions, Mr. Hrynik relied on the representations made to him in the Bosworth letter about the $300,000 purchase price for MSSTA's non-S account assets as set forth in that letter and about MSSTA's redemption of Mr. Carter's MSSTA stock for $300,000. In rendering that solvency opinion, Mr. Hrynik was not aware that the parties to the MSSTA transaction had agreed that the Scotts could buy a specified number of shares of AST stock for a nominal cash amount.

Mr. Hrynik sent MSSTA two statements dated June 30, 1989, and September 15, 1989, which billed MSSTA $525 and $2,085, respectively, for various activities related to the MSSTA trans- action, including "review of documents related to asset sale and stock redemption, analysis of tax consequences of the same".

At some undisclosed time prior to September 14, 1989, the closing date, Ms. Scott learned about the MSSTA transaction from Mr. Scott. She understood from him that, after the MSSTA trans- action, Mr. Scott would own an aggregate stock interest in AST, a corporation that was larger than MSSTA, which was smaller than his stock interest in MSSTA before that transaction. Although Ms. Scott was present at certain meetings between Mr. Bosworth and Mr. Scott shortly before the closing of the MSSTA transaction and reviewed certain documents relating to that transaction, she did not participate in the discussions relating to that trans-

action. In addition, while she was present at the closing of the MSSTA transaction, Ms. Scott was not aware of the purchase price that she was paying for the AST stock which she was acquiring as part of the MSSTA transaction. Ms. Scott agreed to the MSSTA transaction because she relied on and accepted Mr. Scott's recommendation to her that it was desirable to effect that transaction.

On the closing date, pursuant to the amended asset purchase agreement, MSSTA sold substantially all of its assets to AST, except the S accounts that MSSTA retained, and AST transferred $300,000 directly to MSSTA for those assets. On the same date, pursuant to the stock redemption agreement, Mr. Carter transferred his stock interest in MSSTA (viz., 52,000 shares of MSSTA stock) to, and he received $300,000 from, MSSTA. Thereafter, Mr. Scott and Ms. Scott each owned 50 percent of the stock of MSSTA, and AST did not own any stock of MSSTA.

Also on the closing date, pursuant to a "SUBSCRIPTION AGREEMENT" (subscription agreement) between Mr. Scott and AST and a subscription agreement between Ms. Scott and AST, each of them purchased 6,150 shares of AST stock and transferred $615,[4] or ten

---

[4] In the stipulation of facts (stipulation), the parties stipulated that the terms of each subscription agreement stated that Mr. Scott and Ms. Scott each purchased 6,150 shares of AST common stock for $6,150. On brief, the parties point out, and we agree, that the stipulation is wrong because reliable evidence in the record establishes that the price paid under each subscription

(continued...)

cents a share, to AST. According to the terms of each subscription agreement, the transfer of 6,150 shares of AST stock to Mr. Scott and Ms. Scott, respectively, was contingent on (1) AST's purchase of MSSTA's assets in accordance with the asset purchase agreement and (2) the closing of the other subscription agreement. In this regard, each subscription agreement stated in pertinent part:

> The purchase [of AST stock] will take place upon AST completing its purchase of the assets of Mountain States Stock Transfer Agents, Inc. in accordance with an Agreement for Purchase and Sale of Assets dated September 7, 1989 ("Asset Purchaser [sic] Agreement") * * *. If the closing under the Asset Purchase Agreement has not occurred on or before September 30, 1989, unless extended for up to 30 days at the sole discretion of AST * * *, the escrowed purchase price [for the AST stock] will be returned promptly and without interest to Purchaser, and this [subscription] Agreement shall be deemed terminated.

In addition to the Scotts' paying $1,230 for an aggregate 33-percent stock interest in AST as set forth in the subscription agreements, as consideration for the Scotts' acquisition of about 36 percent of that stock interest, or in the aggregate 12 percent of AST's stock, Mr. Scott agreed to guarantee a bank loan that AST sought in order to finance in part AST's acquisition of MSSTA's assets and to forgo for a period of several years contributions by AST for Mr. Scott's benefit to its profit-sharing plan. As a result of the MSSTA transaction, Mr. Scott and Ms.

---

[4](...continued)
agreement was $615, and not $6,150.

Scott each owned 16-1/2 percent, or in the aggregate 33 percent, of the stock of AST.

On the closing date, AST also paid Mr. Scott $25,000 pursuant to a document describing a consulting agreement between Mr. Scott and AST (Scott-AST consulting agreement). Also on that date, pursuant to an agreement by Mr. Carter and his wife that appeared at the end of the asset purchase agreement, Mr. Carter and AST entered into a "CONSULTING AGREEMENT" (Carter-AST consulting agreement). Pursuant to the terms of the Carter-AST consulting agreement, AST agreed to engage Mr. Carter as a consultant with respect to certain matters through September 13, 1993, and Mr. Carter also agreed that, during the term of the Carter-AST consulting agreement, he would not directly or indirectly have any interest as owner, partner, agent, stockholder, consultant, employee, or otherwise in any business that engaged in any securities transfer agent business in the United States. In exchange for Mr. Carter's agreement to consult and not to compete with AST, AST was obligated under the Carter-AST consulting agreement to pay Mr. Carter a total of $525,000 over four years. Immediately following the signatures on the Carter-AST consulting agreement, a paragraph entitled "Consent", which was executed by Mr. Scott as the president of MSSTA, included MSSTA's acknowledgment and approval of that agreement.

At the closing of the MSSTA transaction, Mr. Scott, in his capacities as president, director, and stockholder of MSSTA, knew, and consequently MSSTA knew, inter alia, that (1) the MSSTA transaction took the form that it did because Mr. Scott did not want to pay any taxes as a result of that transaction; (2) the Scotts were not purchasing an aggregate 21-percent stock interest in AST in exchange for the nominal cash amount of ten cents a share and/or their aggregate 48-percent stock interest in MSSTA;[5] (3) AST was not purchasing MSSTA's assets for only $300,000, but instead, in substance, was purchasing those assets for an amount substantially in excess of $300,000 consisting of cash and a 21-percent stock interest in AST; (4) the Service could decide not to accept the return positions that MSSTA and the Scotts intended to take with respect to the MSSTA transaction (viz., MSSTA would report only the $300,000 that it received directly from AST as the amount realized from the sale of MSSTA's assets, and the Scotts would not report any income since there were no liquidating distributions to them by MSSTA) because the Scotts would be paying only a nominal cash amount for a 21-percent stock interest in AST and would not be reporting any income attributable to liquidating distributions by MSSTA to them; and (5) MSSTA's tax liability would be about $10,000, and the Scotts would not

---

[5] The Scotts acquired a total of 33 percent of the stock of AST as part of the MSSTA transaction. See supra p. 19.

owe any tax as a result of the MSSTA transaction only if the Service accepted those return positions of MSSTA and the Scotts. At the closing of the MSSTA transaction, Mr. Scott, in his capacities as president, director, and stockholder of MSSTA, was bound to know, and consequently MSSTA was bound to know, that MSSTA would owe tax substantially in excess of $10,000 on the consideration, which was substantially in excess of $300,000, that he and MSSTA knew AST paid to purchase MSSTA's assets.

With the closing of the MSSTA transaction, including (1) the amended asset purchase agreement, (2) the Carter-AST consulting agreement, (3) the stock redemption agreement, and (4) the subscription agreements, MSSTA was left insolvent as of the closing date, considering the effect of MSSTA's unpaid tax liability.

As part of the MSSTA transaction, all of MSSTA's employees became employees of AST, including Mr. Scott who became president of AST. Only Mr. Scott also remained an employee of MSSTA.

After the closing date, Mr. Bosworth contacted Silverado Savings and Loan, which was the lessor on the lease obligation for which Mr. Scott also was personally liable, to negotiate a termination of that lease. Mr. Bosworth advised Silverado Savings and Loan that MSSTA was vacating the space that it was leasing either in December 1989 or January 1990, and MSSTA did, in fact, move out around that time. Silverado Savings and Loan took no action against MSSTA or Mr. Scott with respect to that

lease.  During early 1990, AST exercised its option under the option agreement and purchased from MSSTA the 45 S accounts for $22,500.

In January 1991, Mr. Scott's services as president of AST were terminated after Mr. Scott, Mr. Harrison, and Mr. Hall had a dispute over management styles.  AST offered to purchase the Scotts' aggregate 33-percent stock interest in that corporation, but Mr. Scott disagreed with the purchase price that AST offered.  As a result of, inter alia, that disagreement over the purchase price, the Scotts sued AST as well as Mr. Harrison and Mr. Hall individually.  On June 27, 1991, that lawsuit was settled, and, pursuant to the terms of the settlement, AST redeemed the Scotts' aggregate 33-percent stock interest in AST and agreed to indemnify the Scotts in an aggregate maximum amount of $30,000 for any tax liability of MSSTA for which they were determined to be liable.

Beginning around late April 1991, the Service audited MSSTA's 1989 return (Form 1120).  As part of that audit, the Service examined the MSSTA transaction, including MSSTA's sale of its assets to AST.

Pursuant to section 6501(c)(4), on June 25, 1993, and on July 22, 1994, MSSTA and respondent consented in writing to extend the time within which to assess MSSTA's tax liability for 1989 to October 31, 1994, and February 28, 1995, respectively.

The Service's revenue agent auditing MSSTA's 1989 return preliminarily proposed, inter alia, that MSSTA realized $1.6 million on that sale and that MSSTA was liable for certain penalties.

Attached to petitioners' 1991 return, which was filed on August 4, 1992, was a statement, entitled "DISCLOSURE STATEMENT OF TRANSACTION BETWEEN THOMAS H. AND LYNN D. SCOTT ("TAXPAYERS") AND AMERICAN SECURITIES TRANSFER, INC. ("AST")", which stated in pertinent part:

> On June 27, 1991, the taxpayers' 12,300 shares of common stock of AST were redeemed by the corporation, AST. * * *
>
>      *      *      *      *      *      *      *
>
> The 12,300 shares of AST stock sold have a cost basis of $749,760.  This basis represents the value assigned to AST shares as determined by the Internal Revenue Service in their examination of Mountain States Stock Transfer Agents, Inc. (MSSTA) * * * for tax year 1989.

Around January or February 1992, petitioners retained J. William Callison (Mr. Callison) to represent MSSTA and themselves with respect to the Service's examination of the MSSTA transaction.  Mr. Callison participated in settlement negotiations with Service representatives regarding its examination of the MSSTA transaction.  On December 23, 1994, Form 906-C, Closing Agreement on Final Determination Covering Specific Matters (closing agreement), was entered into by the Service, Mr. Carter, Mr. Scott, Ms. Scott, MSSTA, and AST.  The closing agreement,

which referred to petitioners collectively as "Scott", stated in pertinent part:

NOW, THEREFORE, IT IS HEREBY DETERMINED AND AGREED for Federal Income Tax purposes, that:

1.  The amount realized from AST upon the sale of * * * MSSTA's assets was $801,820 resulting in an additional Federal income tax liability of MSSTA in taxable year 1989 of $164,981.

2.  The value of the consulting and covenant not to compete agreements between AST and Carter was $325,016.  The additional amount paid to Carter of $199,984 by AST was an amount realized by MSSTA for MSSTA's assets.

3.  A portion of the 12,300 shares of AST stock transferred to Scott and a portion of the consulting fee paid to Scott were amounts realized by MSSTA for MSSTA's assets.  The value of the AST stock transferred and the consulting fee paid to Scott for MSSTA's assets was $199,652.

4.  This agreement makes no determination with respect to whether one or more of these parties (Carter, Scott, or AST) is personally liable as a transferee for any additional Federal income tax liability of MSSTA.

5.  Carter, Scott, AST, MSSTA and the Internal Revenue Service agree that in the event one or more of these parties (Carter, Scott, and/or AST) is found to be personally liable as a transferee, the liability is $164,981 plus interest from March 15, 1990.

The total amount of (1) that portion of the value of the 6,150 shares of AST stock issued by AST to Mr. Scott and (2) the consulting fee paid to him, which total amount was an amount realized by MSSTA for MSSTA's assets, was $104,580.  The amount of the value of that portion of the 6,150 shares of AST stock

issued by AST to Ms. Scott, which was an amount realized by MSSTA for MSSTA's assets, was $95,072.

During April 1996, respondent's revenue officer, Linda Wievers (Ms. Wievers), was assigned to collect MSSTA's unpaid tax liability. Ms. Wievers followed normal collection procedures in her attempts to collect that liability from MSSTA. Mr. Callison informed Ms. Wievers that, as of November 27, 1996, MSSTA, a corporation in good standing and authorized to conduct its affairs within the State of Colorado, had no assets or income with which to pay MSSTA's unpaid tax liability. In late January 1997, Ms. Wievers concluded that MSSTA did not have any assets or income with which to satisfy that liability.

On January 10, 1995, respondent issued separate notices of transferee liability to Mr. Scott and Ms. Scott, respectively, in which respondent determined that they are liable as transferees of MSSTA (1) in amounts not exceeding $104,580 and $95,072, respectively, for MSSTA's unpaid tax liability and (2) for interest "as provided by law".

## OPINION

We shall first address certain evidentiary matters. At trial, we admitted into evidence conditionally, subject to our ruling on admissibility, certain evidence to which respondent objected.

Paragraph 25 of the stipulation (stipulation 25) states:

25. Respondent did not assert the accuracy-related penalty for a substantial underpayment, pursuant to I.R.C. § 6662(a), against MSSTA. Attached hereto as Petitioners' Exhibit 11 is a letter written by J. William Callison concerning his request that Respondent not assert such penalty. The stipulation is expressly limited to the existence of this letter, and is not intended as a stipulation to the truth of the matters asserted therein. Respondent specifically reserves the right to object to this stipulation, including the referenced exhibit, as inadmissible pursuant to Fed. R. Evid. 408.

Respondent objects to the admission into evidence of (1) the first sentence of stipulation 25, (2) petitioners' exhibit 11, the letter written by Mr. Callison (Mr. Callison's letter) that is referenced in stipulation 25, and (3) certain testimony of Mr. Callison regarding that letter and his recollection of his discussions with the revenue agent who was auditing MSSTA's 1989 return. The principal ground for respondent's objections to those matters is that they are inadmissible under rule 408 of the Federal Rules of Evidence (FRE 408) because they constitute "evidence of conduct or statements made in compromise negotiations".[6]

As we understand their position, petitioners contend that the evidence to which respondent objects is not excluded by FRE 408 because (1) respondent "had not yet asserted" that MSSTA was

---

[6] Respondent also objects to the evidence in question on relevancy grounds and on the ground that the evidence in question is an attempt to go behind the notices. As for the relevancy objection, we indicated at trial that, assuming arguendo that we were to find the evidence to which respondent objects to be otherwise admissible, we shall give it whatever weight we deem appropriate.

liable for the accuracy-related penalty at the time Mr. Callison's letter was sent to respondent's representative and (2) "Mr. Callison did not make any settlement offer or concession to the revenue agent in exchange for the penalty not being asserted."

FRE 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

With respect to respondent's objection to the first sentence of stipulation 25, which states that "Respondent did not assert the accuracy-related penalty for a substantial underpayment, pursuant to I.R.C. § 6662(a), against MSSTA", it is not clear to what point in time during the Service's examination of MSSTA that sentence is referring. According to Mr. Callison's testimony, the Service's revenue agent auditing MSSTA's 1989 return preliminarily proposed that MSSTA was liable for certain penalties.[7]

---

[7] It is not clear how Mr. Callison learned about what that agent
(continued...)

Pursuant to the closing agreement that was signed by, inter alia, the Service, MSSTA, and the Scotts, MSSTA was not liable for any penalties.  In any event, the first sentence of stipulation 25 is not "Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount". Fed. R. Evid. 408.  Nor is it "Evidence of conduct or statements made in compromise negotiations".  Id.  Consequently, we do not find the first sentence of stipulation 25 to be inadmissible under FRE 408.[8]  Accordingly, we unconditionally admit that sentence into evidence and make it a part of the record in this case.

With respect to respondent's objection to Mr. Callison's letter and certain of his testimony regarding that letter and his recollection of his discussions with the revenue agent who was auditing MSSTA's 1989 return, the record establishes that Mr. Callison's letter was written at a time when there were ongoing settlement negotiations between the Scotts and MSSTA and the

[7](...continued)
had preliminarily proposed.  We think that it is reasonable to conclude that Mr. Scott so informed Mr. Callison.

[8]  In addition, we reject respondent's contention that the first sentence of stipulation 25 should be excluded from evidence because it is an attempt to go behind the notices.

Service.[9]  We find that Mr. Callison's letter and his testimony to which respondent objects are "Evidence of conduct or statements made in compromise negotiations", Fed. R. Evid. 408, and are inadmissible under FRE 408.[10]  See <u>McPike, Inc. v. United States</u>, 15 Cl. Ct. 94, 98-99 (1988).

We shall now address the transferee liability issues in this case.  Respondent bears the burden of showing that each petitioner is liable as a transferee of property of MSSTA, but not that MSSTA was liable for MSSTA's unpaid tax liability.  See sec. 6902(a); Rule 142(d).

Section 6901 provides in pertinent part:

> SEC. 6901(a).  Method of Collection.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

---

[9]  For example, the record shows that the revenue agent auditing MSSTA's 1989 return preliminarily proposed that MSSTA realized $1.6 million from the sale of substantially all of its assets to AST.  By way of further illustration, petitioners stated in their 1991 return that the stock of AST that they acquired had "a cost basis of $749,760" which was "the value assigned to * * * [those] shares as determined by the Internal Revenue Service in their examination of * * * [MSSTA]".  Nonetheless, the Service and, inter alia, MSSTA and the Scotts ultimately agreed in the closing agreement that MSSTA realized $801,820 from the sale of substantially all of its assets to AST and that $199,652 of (1) the value of the AST stock transferred to the Scotts and (2) the consulting fee paid to Mr. Scott was an amount realized by MSSTA for MSSTA's assets.

[10]  Even if we had held differently on the evidentiary matters at issue, such a holding would not have affected our conclusions with respect to the transferee liability issues presented.

(1) Income, estate, and gift taxes.--

(A) Transferees.--The liability, at law or in equity, of a transferee of property--

(i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),

\*     \*     \*     \*     \*     \*     \*

(h) Definition of Transferee.--As used in this section, the term "transferee" includes donee, heir, legatee, devisee, and distributee * * *.

The courts have recognized that section 6901 does not create or define a substantive liability, but merely provides a procedure by which the Government may collect from a transferee of property unpaid taxes owed by the transferor of the property. Commissioner v. Stern, 357 U.S. 39, 42 (1958); Hagaman v. Commissioner, 100 T.C. 180, 183 (1993). The existence and extent of a transferee's liability is determined under applicable State law. See Commissioner v. Stern, supra at 42-45; Hagaman v. Commissioner, supra at 183-185. The parties agree that the applicable State law in this case is the law of the State of Colorado.

Respondent argues that, as is true in other areas of the tax law, see Gregory v. Helvering, 293 U.S. 465, 469-470 (1935), the substance, and not the form, of the MSSTA transaction controls our determination of whether Mr. Scott and Ms. Scott are liable as transferees of MSSTA. In support of respondent's position, respondent relies principally on Bates Motor Transp. Lines, Inc.

v. Commissioner, 200 F.2d 20 (7th Cir. 1952), affg. 17 T.C. 151 (1951), and Hunn v. United States, 60 F.2d 430 (8th Cir. 1932).

Petitioners counter that the form, and not the substance, of the MSSTA transaction controls our determination of whether Mr. Scott and Ms. Scott are liable as transferees of MSSTA. In support of their position, petitioners rely principally on Vendig v. Commissioner, 229 F.2d 93 (2d Cir. 1956), revg. 22 T.C. 1127 (1954).[11]

We shall turn first to Vendig v. Commissioner, supra, on which petitioners rely. In that case, Mavco, Inc. (Mavco) owned all of the outstanding stock of Mavco Sales, Inc. (Sales) except for 100 shares of preferred stock that were held by Ms. Vendig. Vendig v. Commissioner, supra at 94. Pursuant to resolutions adopted by the respective boards of directors of Mavco and Sales, Ms. Vendig exchanged her 100 shares of Sales preferred stock for 100 shares of Mavco preferred stock of equal value. Id. at 94-95. After that exchange, Sales dissolved and all of its assets, subject to all of its liabilities, were transferred as a liqui-

_____

[11] Petitioners also rely on (1) United States v. Rolland, 10 AFTR 2d 5371, 62-2 USTC par. 9671 (S.D. Fla. 1962), which cites with approval Vendig v. Commissioner, 229 F.2d 93 (2d Cir. 1956), revg. 22 T.C. 1127 (1954), and (2) Pittsburgh Realty Inv. Trust v. Commissioner, 67 T.C. 260 (1976), to support their position that the form, and not the substance, of the MSSTA transaction should govern our resolution of the transferee liability issues in this case. We find United States v. Rolland, supra, and Pittsburgh Realty Inv. Trust v. Commissioner, supra, to be distinguishable from the present case, and petitioners' reliance on those cases to be misplaced.

dating distribution to Mavco, its sole stockholder. Id. at 94. As a consequence, Sales no longer had any assets with which to satisfy its unpaid tax liabilities for 1944, 1945, and 1946. Because Mavco assumed all of the liabilities of Sales, respondent could have sought to collect all of the unpaid taxes of Sales from Mavco. However, respondent chose to seek to collect $10,000 of those taxes from Ms. Vendig on the ground that she was liable for that amount as a transferee of the assets of Sales. Id.

In Vendig v. Commissioner, supra at 95, the U.S. Court of Appeals for the Second Circuit (Court of Appeals for the Second Circuit) concluded: "By exchanging stock of Sales for stock of Mavco petitioner did not remove cash or other property from Sales, thereby harming creditors of Sales who were entitled to be paid before any distributions to shareholders." The Court of Appeals for the Second Circuit held that, because Ms. Vendig did not receive, directly or indirectly, any property of Sales, she was not a transferee of Sales within the meaning of section 311 of the Internal Revenue Code of 1939, the predecessor to section 6901. Id. at 94. In so holding, the Court of Appeals for the Second Circuit appears to have relied on the form of the exchange of Ms. Vendig's Sales preferred stock for preferred stock in Mavco when it stated:

> We accept the following principles: Where the vendee
> issues its stock to the vendor corporation in return
> for assets of the vendor, then that stock becomes the
> asset of the vendor, and the stockholders who receive

that asset are transferees of the vendor, and liable
for its taxes * * *.  But where, as in this case, the
vendee issues its stock directly to the stockholders,
then that stock never becomes a part of the vendor's
assets, for these assets become the property of the
vendee corporation when the vendor corporation ceases
to exist.

It is true that this holding may allow the par-
ties, under some circumstances, to vary the tax conse-
quences according to the manner in which a reorganiza-
tion is conducted, but this does not affect the amount
of the  tax or the availability of property to satisfy
it.  [Vendig v. Commissioner, supra at 96-97.]

Respondent contends, and we agree, that Vendig v. Commis-
sioner, supra, is distinguishable from the instant case.  In
Vendig, the form of the transaction was structured so that Ms.
Vendig transferred to Mavco her Sales preferred stock in return
for Mavco preferred stock of equal value.  Vendig v. Commission-
er, supra at 94-95.  In contrast, in the instant case, the form
of the MSSTA transaction was structured so that, pursuant to the
respective subscription agreements, Mr. Scott and Ms. Scott each
acquired, inter alia, 10.5 percent, or in the aggregate 21 per-
cent, of the stock of AST for the nominal cash amount of ten
cents a share,[12] which petitioners concede was an inadequate

---

[12]  Although after the closing of the MSSTA transaction the
Scotts owned in the aggregate 33 percent of AST's stock, re-
spondent concedes that, of that aggregate 33-percent stock inter-
est, the Scotts received an aggregate 12-percent stock interest
in AST in exchange for not only the nominal cash amount of ten
cents a share, but also Mr. Scott's guarantee of a loan and his
agreement to forgo for several years contributions by AST for his
benefit to AST's profit-sharing plan.  We shall hereinafter ad-
dress only the aggregate 21-percent stock interest in AST that

(continued...)

price for that stock.[13]  In addition, in <u>Vendig v. Commissioner</u>,
<u>supra</u>, the Court of Appeals for the Second Circuit did not in-
dicate that Ms. Vendig's exchange of her Sales preferred stock
for Mavco preferred stock of equal value was contingent on
Mavco's purchase of all of the assets of Sales.  In contrast, in
the instant case, we have found that the Scotts' acquisition of
AST stock in the MSSTA transaction was contingent upon, inter
alia, the closing of the asset purchase agreement between AST and
MSSTA.

Another distinction between <u>Vendig v. Commissioner</u>, <u>supra</u>,
and the present case is that in <u>Vendig</u> the tax liability of Sales
in question did not arise as a result of Ms. Vendig's exchange of
her Sales stock for Mavco stock of equal value and the liqui-
dation of Sales, and the amount of that tax liability was not
affected by the Court of Appeals for the Second Circuit's holding
in <u>Vendig</u> that the form of those transactions controlled the
transferee liability issue presented there.  <u>Vendig v. Commis-
sioner</u>, <u>supra</u> at 96-97.  In the instant case, the tax liability

_____

[12](...continued)
the Scotts acquired pursuant to the subscription agreements for
the nominal cash amount of ten cents a share.

[13]  Although urging that the form, and not the substance, of the
MSSTA transaction is controlling here, petitioners nonetheless
contend that, despite the form of their respective purchases of
10.5 percent of AST's stock, as reflected in the subscription
agreements, each of them, in substance, exchanged a 24-percent
stock interest in MSSTA for a 10.5-percent stock interest in AST.
We shall address that contention below.

of MSSTA arose as a result of the MSSTA transaction and the amount of that liability would turn out to be different from that determined under the closing agreement if we were to hold that the form of that transaction controls the transferee liability issues presented here.[14]  Cf. Pert v. Commissioner, 105 T.C. 370 (1995) (transferee bound by closing agreement made by transferor with respect to latter's tax liability).

Not only do we find Vendig v. Commissioner, 229 F.2d 93 (2d Cir. 1956), to be distinguishable from the instant case, it is noteworthy that the Court of Appeals for the Second Circuit in Abegg v. Commissioner, 429 F.2d 1209, 1215 (2d Cir. 1970), affg. 50 T.C. 145 (1968), did not rely on, or even cite, Vendig in deciding that the substance of the transaction presented to it in Abegg governed its resolution of the transferee liability issue involved there.

We reject petitioner's contention that in the instant case Vendig v. Commissioner, supra, requires that the form, and not the substance, of the MSSTA transaction control our resolution of the transferee liability issues presented.

---

[14]  Such a holding also would be inconsistent with the parties' stipulations that $104,580 of the value of the 6,150 shares of AST stock issued by AST to Mr. Scott and of the consulting fee paid to him was an amount realized by MSSTA for MSSTA's assets and that $95,072 of the value of the 6,150 shares of AST stock issued by AST to Ms. Scott was an amount realized by MSSTA for MSSTA's assets.

We also reject petitioners' contention that <u>Bates Motor Transp. Lines, Inc. v. Commissioner</u>, 200 F.2d 20 (7th Cir. 1952), and <u>Hunn v. United States</u>, 60 F.2d 430 (8th Cir. 1932), on which respondent relies, do not support respondent's position in the present case. In <u>Bates Motor Transp. Lines, Inc. v. Commissioner</u>, <u>supra</u> at 24, Harry F. Chaddick (Mr. Chaddick) owned around 64 percent of the stock of Bates Motor Transport Lines, Inc. (Bates) and 100 percent of the stock of Standard Freight Lines, Inc. (Standard) and was the president of both companies. In form, Standard purchased all of the assets of Bates in exchange for Standard's assumption of the liabilities of Bates and Standard's issuance of its stock to the stockholders of Bates, including Mr. Chaddick. <u>Id.</u> at 22-23. One of the issues in <u>Bates Motor Transp. Lines, Inc. v. Commissioner</u>, <u>supra</u> at 24-25, was whether Mr. Chaddick was liable as a transferee of Bates. The U.S. Court of Appeals for the Seventh Circuit (Court of Appeals for the Seventh Circuit) held that he was. <u>Id.</u> at 25. In so holding, the Court of Appeals for the Seventh Circuit found that the substance of the transactions there involved was Bates' sale of its assets to Standard in exchange for, inter alia, Bates' receipt of the stock of Standard, which Bates transferred as liquidating distributions to its stockholders, including Mr. Chaddick. <u>Id.</u> The Court of Appeals for the Seventh Circuit, <u>id.</u>, quoted with approval the following conclusions of this Court

in Bates Motor Transp. Lines, Inc. v. Commissioner, 17 T.C. 151, 160 (1951), affd. 200 F.2d 20 (7th Cir. 1952):

> The fact that the arrangement provided for Standard to issue such shares directly to the stockholders of Bates, who were to surrender to Standard the shares of stock they held in Bates, was no different in effect than if Standard had issued the shares directly to Bates, who, in turn, had called in its outstanding stock and in liquidation distributed to its stock-holders the shares of stock in Standard. The result in each instance would be for the stockholders of Bates to receive the stock in Standard and leave Bates insolvent and without funds to pay its debts. The short cut em-ployed by which Standard issued its stock directly to the stockholders of Bates in nowise relieved those stockholders of their liability as transferees of the assets of Bates.

Petitioners question the foregoing reliance by the Court of Appeals for the Seventh Circuit on substance, and not form, in Bates Motor Transp. Lines, Inc. v. Commissioner, supra. They point out that the Court of Appeals for the Second Circuit in Vendig v. Commissioner, supra at 95-96, stated that, to the ex-tent that Bates Motor Transp. Lines, Inc. v. Commissioner, supra, is not distinguishable on its facts from Vendig, the Bates case was wrongly decided. We have already determined that we shall not rely on the Vendig case because it is distinguishable from the instant case.

Petitioners also attempt to distinguish Bates Motor Transp. Lines, Inc. v. Commissioner, supra, from the instant case. They point out that the transferee in Bates Motor Transp. Lines, Inc. v. Commissioner, supra, owned all the stock of Standard and 64

percent of the stock of Bates, was president of both those companies, and therefore "orchestrated the asset sale".  In contrast, according to petitioners, prior to the MSSTA transaction in the instant case, neither of them owned any stock of AST or was an officer of that company, and neither of them had a controlling interest in MSSTA.  Consequently, petitioners contend, Mr. Scott and/or Ms. Scott did not "orchestrate" the MSSTA transaction.  Petitioners' contention completely ignores the fact that it was because of Mr. Scott's unwillingness to pay any tax as a result of the MSSTA transaction that that transaction was cast in a form in which MSSTA received only $300,000 directly from AST for substantially all of its assets; MSSTA distributed all of those sales proceeds to Mr. Carter, a 52-percent stockholder of MSSTA, and nothing to the Scotts, 48-percent stockholders of MSSTA; and the Scotts acquired a 21-percent stock interest in AST for a nominal and inadequate price.

Petitioners also attempt to distinguish Bates Motor Transp. Lines, Inc. v. Commissioner, supra, from the instant case by asserting that, unlike Standard which was the purchasing corporation in the Bates Motor Transp. Lines, Inc. case, AST which was the purchasing corporation in the instant case transferred significant assets to MSSTA as part of the MSSTA transaction. Petitioners' assertion disregards the fact that in Bates Motor Transp. Lines, Inc. v. Commissioner, supra at 22-23, Standard

assumed the liabilities of Bates and issued its stock to the stockholders of Bates in exchange for all of Bates' assets. Thus, Standard did transfer significant consideration to Bates in exchange for Bates' assets.

We conclude that Bates Motor Transp. Lines, Inc. v. Commissioner, supra, supports respondent's position that the substance, and not the form, of the MSSTA transaction controls our resolution of the transferee liability issues presented.

We also conclude that Hunn v. United States, supra, supports respondent's position that the substance, and not the form, of the MSSTA transaction governs our determination of the transferee liability issues in this case, and we find petitioners' contention that the Hunn case is distinguishable from the present case to be without merit. In Hunn v. Commissioner, 60 F.2d at 430, the United States brought a suit in equity against certain individuals as the former stockholders of Young Bros. Wall Paper & Paint Company (Young) to recover income tax due from Young (Young's tax liability). The form of the transaction in Hunn was as follows: Subsequent to the year to which Young's tax liability pertained, the stockholders of Young passed a resolution authorizing Young (1) to sell all of its assets to Waggener Paint & Glass Company of Kansas City, Missouri (Waggener), for $54,000 and (2) thereafter to liquidate its affairs and dissolve. Hunn v. Commissioner, supra at 431. At the same time, the stock-

holders of Young agreed that, instead of Waggener's paying $54,000 in cash for all of Young's assets, which was to be distributed to the stockholders of Young upon its dissolution, those stockholders would receive from Waggener "as their 'distributive shares of said amount of cash' the common stock of the Waggener Paint & Glass Company in the ratio of one and one-fifth shares of the common stock of the Waggener Paint & Glass Company for each share of stock in the Young Bros. Wall Paper & Paint Company." Pursuant to the foregoing agreement of the Young stockholders, Waggener acquired all of the assets of Young, and the stockholders of Young received for each share of Young stock held one and one-fifth shares of Waggener stock. Id. Waggener also received Young stock, but Young was not immediately dissolved, as provided for in the Young stockholders' resolution. Instead, the Young charter was permitted to be forfeited by the State of Kansas in the year following the foregoing transaction. The only reason for continuing the existence of Young, instead of dissolving it after all of its assets were transferred to Waggener, was to ensure the continuance of a lease during negotiations to assign that lease. Id. at 431-432.

According to the U.S. Court of Appeals for the Eighth Circuit (Court of Appeals for the Eighth Circuit), the trial court had found that although all of the assets of Young were transferred to Waggener in consideration of the issuance by Waggener

to the Young stockholders of Waggener stock equal in value to $54,000, in substance, (1) the Waggener stock that those stockholders received was transferred by Waggener to Young in return for Young's assets, and (2) Young distributed such stock to its stockholders in a transaction that was equivalent to a dissolution of Young. Hunn v. Commissioner, supra at 432. Consequently, the trial court had held that those stockholders were liable for Young's tax liability. The Court of Appeals for the Eighth Circuit affirmed the trial court. In so doing, the Court of Appeals for the Eighth Circuit concluded that the substance, and not the form, of the transaction involved there was controlling. Id.

We shall now determine the substance of the MSSTA transaction. As we understand it, respondent contends that all of the transactions that were effected as part of the MSSTA transaction on September 14, 1989, are related and that, in substance, on that date (1) MSSTA sold substantially all of its assets to AST for an amount substantially in excess of $300,000;[15] (2) a total of $199,652 (i.e., $190,144 of the value of the aggregate stock interest in AST acquired by the Scotts and $9,508[16] of the fee

[15] AST acquired the S accounts during 1990, and that purchase is not at issue in this case. Our discussion hereinafter shall be limited to the sale of MSSTA's non-S account assets that took place on Sept. 14, 1989, the closing date.

[16] The parties agree that $104,580 of the value of the stock of
                                                    (continued...)

received by Mr. Scott pursuant to the Scott-AST consulting agreement) was transferred by AST to, and was an amount realized by, MSSTA from the sale of its assets to AST; and (3) of the total consideration that MSSTA realized from the sale of its assets to AST, MSSTA distributed (a) to Mr. Scott stock of AST equal in value to $95,072 (i.e., a 10.5-percent stock interest in AST) and $9,508 in cash, or a total of $104,580, and (b) to Ms. Scott stock of AST equal in value to $95,072 (i.e., a 10.5-percent stock interest in AST).[17]  Stated differently, respondent contends that, in substance, the Scotts did not acquire from AST an aggregate 21-percent stock interest in that company for ten cents a share.  Rather, according to respondent, in substance, the Scotts acquired that aggregate stock interest, and Mr. Scott

---

[16](...continued)
AST acquired by Mr. Scott and of the fee received by him pursuant to the Scott-AST consulting agreement and $95,072 of the value of the stock in AST acquired by Ms. Scott (or a total of $199,652) were amounts realized by MSSTA from the sale of its assets to AST.  Consequently, we calculated the amount of that fee, which is an amount that MSSTA realized from the sale of its assets, to be $9,508.

[17]  We do not understand respondent to be contending that, in substance, instead of MSSTA's receiving from AST an aggregate 21-percent stock interest in AST valued at $190,144 which MSSTA distributed to the Scotts and $9,508 in cash which it distributed to Mr. Scott, MSSTA received from AST cash in the total amount of $199,652, (1) $9,508 of which MSSTA distributed to Mr. Scott and (2) the balance of which (i.e., $190,144) MSSTA distributed to the Scotts who in turn used that $190,144 to buy an aggregate 21-percent stock interest in AST.  However, even if respondent were advancing such a contention, our conclusions with respect to the transferee liability issues presented would not change.

also received $9,508 in cash, as distributions from MSSTA of property that it received from AST as part of the consideration that AST paid MSSTA to purchase MSSTA's assets.

Petitioners counter that not all of the transactions that are part of the MSSTA transaction are related. For example, they contend that AST's payment of $300,000 to MSSTA under the asset purchase agreement was not related to the subscription agreements between AST and Mr. Scott and Ms. Scott, respectively. On the record before us, we find that all of the transactions that are part of the MSSTA transaction are related. Indeed, the respective purchases by the Scotts of AST's stock under the subscription agreements were expressly made contingent on, inter alia, completion of AST's purchase of MSSTA's assets under the asset purchase agreement. In this regard, each subscription agreement stated in pertinent part:

> The purchase [of AST stock] will take place upon AST completing its purchase of the assets of Mountain States Stock Transfer Agents, Inc. in accordance with an Agreement for Purchase and Sale of Assets dated September 7, 1989 ("Asset Purchaser [sic] Agreement") * * *. If the closing under the Asset Purchase Agreement has not occurred on or before September 30, 1989, unless extended for up to 30 days at the sole discretion of AST * * *, the escrowed purchase price [for the AST stock] will be returned promptly and without interest to Purchaser, and this [subscription] Agreement shall be deemed terminated.

Petitioners further contend that they received an aggregate 21-percent stock interest in AST directly from AST, and not as a distribution from MSSTA, and that they did not pay only ten cents

a share for that stock interest. Instead, according to petitioners, in substance, "Petitioners gave up a 48% ownership interest in MSSTA in order to receive a 21% interest in AST." While we agree with petitioners that they did not pay only ten cents a share to acquire an aggregate 21-percent stock interest in AST, on the record before us, we reject their contention that they "gave up a 48% ownership interest in MSSTA in order to receive a 21% interest in AST." In fact, after the MSSTA transaction, AST did not own any stock of MSSTA. Instead, after that transaction, each of the Scotts owned 50 percent of the stock of MSSTA. Moreover, we can find no reason in the record presented, and petitioners have offered none, as to why AST would be willing to exchange 21 percent of its stock worth $190,144 for the Scotts' 48-percent stock interest in MSSTA, which became a 100-percent stock interest in that company after the MSSTA transaction was closed on September 14, 1989, and which was worth no more than $22,500, the aggregate purchase price that AST agreed to pay under the option agreement for the 45 S accounts that MSSTA continued to own after that closing date. Nor can we discern any reason in the record presented, and petitioners have offered none, as to why they would agree, in form, that Mr. Carter, a 52-percent stockholder of MSSTA, was to receive from MSSTA a distribution of all of the proceeds that AST transferred to MSSTA (i.e., $300,000) under the asset purchase agreement,

whereas they, 48-percent stockholders of MSSTA, were to receive nothing from MSSTA, but were to be left after the MSSTA transaction owning 100 percent of the stock of MSSTA, which was worth no more than $22,500.

Based on our examination of the entire record in this case, we find that, in substance, on the closing date (1) MSSTA sold substantially all of its assets to AST for an amount substantially in excess of $300,000; (2) a total of $199,652 (i.e., $190,144 of the value of the aggregate stock interest in AST acquired by the Scotts and $9,508 of the fee received by Mr. Scott pursuant to the Scott-AST consulting agreement) was transferred by AST to, and was an amount realized by, MSSTA from the sale of its assets to AST; and (3) of the total consideration that MSSTA realized from the sale of its assets to AST, MSSTA distributed (a) to Mr. Scott stock of AST equal in value to $95,072 (i.e., a 10.5-percent stock interest in AST) and $9,508 in cash, or a total of $104,580, and (b) to Ms. Scott stock of AST equal in value to $95,072 (i.e., a 10.5-percent stock interest in AST).[18]  On that record, we further find that Mr. Scott is a transferee of property of MSSTA in the amount of $104,580 and that Ms. Scott is a transferee of property of MSSTA in the amount of $95,072.

---

[18]  See supra note 17.

Respondent contends that, as a transferee of property of MSSTA, each petitioner is liable under Colorado law for MSSTA's unpaid tax liability to the extent of the assets that MSSTA transferred to each of them, viz., $104,580 to Mr. Scott and $95,072 to Ms. Scott. In support of that contention with respect to Mr. Scott, respondent relies on (1) Colo. Rev. Stat. sec. 7-5-114(1)(c) (repl. vol. 1986) (repealed 1994) (Colorado liquidation statute), (2) Colo. Rev. Stat. sec. 7-5-114(1)(b) (repl. vol. 1986) (repealed 1994) (Colorado redemption statute), and/or (3) Colo. Rev. Stat. sec. 38-10-117 (repl. vol. 1982) (Colorado fraudulent conveyance statute). In support of respondent's contention with respect to Ms. Scott, respondent relies only on the Colorado fraudulent conveyance statute. Petitioners counter that neither of them is liable under the Colorado statutes on which respondent relies.

We shall turn first to the Colorado fraudulent conveyance statute on which respondent relies because that statute disposes of the transferee liability questions remaining in this case. The Colorado fraudulent conveyance statute provides:

> Every conveyance or assignment in writing or otherwise of any estate or interest in lands, goods, or things in action or of any rents and profits issuing thereupon, and every charge upon lands, goods, or things in action or upon the rents and profits thereof made with the intent to hinder, delay, or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts, or demands, and every bond or other evidence of debt given, suits commenced, or decree or judgment suffered with the like intent as

against the person so hindered, delayed, or defrauded shall be void. [Colo. Rev. Stat. sec. 38-10-117 (repl. vol. 1982)].

The parties do not dispute that, in order for the Colorado fraudulent conveyance statute to apply to the transfer of property by MSSTA to Mr. Scott and the transfer of property by MSSTA to Ms. Scott that we have found in the instant case, it is necessary that MSSTA, the transferor, was insolvent at the time of each such transfer or was rendered insolvent thereby; the purpose of each such transfer was to hinder, delay, or defraud creditors; MSSTA, the transferor, acted with that intent or with an intent to benefit or secure an advantage to itself; and Mr. Scott and Ms. Scott, each of the transferees, knew of, or participated in, MSSTA's intent. See Yetter Well Serv., Inc. v. Cimarron Oil Co., 841 P.2d 1068, 1069-1070 (Colo. Ct. App. 1992); Wright v. Nelson, 242 P.2d 243, 246-247 (Colo. 1952); see also United States v. Morgan, 554 F. Supp. 582, 586 (D. Colo. 1982). The dispute between the parties relates to whether MSSTA and each of the Scotts had the intent necessary to trigger application of the Colorado fraudulent conveyance statute. Respondent contends that they did. Petitioners disagree. In support of their position, petitioners assert:

> In this case, the evidence clearly established that neither MSSTA nor Petitioners knew that there was an unpaid MSSTA tax liability arising from the asset purchase transaction. Petitioners believed they had given up an interest in MSSTA for a comparable interest in AST without any tax consequences. Further, MSSTA

and Mr. Scott relied on the advice of their attorney and their independent Certified Public Accountant, Mr. Hrynik. In addition, MSSTA received Mr. Hrynik's opinion that it could redeem Mr. Carter's MSSTA stock for $300,000, and that it would be able to pay its debts as they became due in the usual course of business. Neither MSSTA's attorney nor its accountant advised MSSTA or either Petitioner concerning any additional MSSTA tax liability. AST represented to Mr. Scott and his attorney that the anticipated MSSTA tax liability was not more than $10,000. Finally, Petitioners' contentions are buttressed by the fact that the revenue agent assigned to the audit waived all penalties against MSSTA.

We shall first consider the positions of the parties with respect to Mr. Scott. Based on our examination of the entire record before us, we find that at the closing of the MSSTA transaction, Mr. Scott, in his capacities as president, director, and stockholder of MSSTA, knew, and consequently MSSTA knew, inter alia, that (1) the MSSTA transaction took the form that it did because Mr. Scott did not want to pay any taxes as a result of that transaction; (2) the Scotts were not purchasing an aggregate 21-percent stock interest in AST in exchange for the nominal cash amount of ten cents a share and/or their aggregate 48-percent stock interest in MSSTA; (3) AST was not purchasing MSSTA's assets for only $300,000, but instead, in substance, was purchasing those assets for an amount substantially in excess of $300,000 consisting of cash and a 21-percent stock interest in AST; (4) the Service could decide not to accept the return positions that MSSTA and the Scotts intended to take with respect to the MSSTA transaction (viz., MSSTA would report only the $300,000

that it received directly from AST as the amount realized from the sale of MSSTA's assets, and the Scotts would not report any income since there were no liquidating distributions to them by MSSTA) because the Scotts would be paying only a nominal cash amount for a 21-percent stock interest in AST and would not be reporting any income attributable to liquidating distributions by MSSTA to them; and (5) MSSTA's tax liability would be about $10,000, and the Scotts would not owe any tax as a result of the MSSTA transaction only if the Service accepted those return positions of MSSTA and the Scotts.  At the closing of the MSSTA transaction, Mr. Scott, in his capacities as president, director, and stockholder of MSSTA, was bound to know, and consequently MSSTA was bound to know, that MSSTA would owe tax substantially in excess of $10,000 on the consideration, which was substantially in excess of $300,000, that he and MSSTA knew AST paid to purchase MSSTA's assets.

On the record presented, we reject petitioners' contentions regarding Mr. Scott's reliance on the advice of AST that MSSTA's tax liability would not exceed $10,000 as a result of the MSSTA transaction and that MSSTA and Mr. Scott did not know that "there was an unpaid MSSTA tax liability arising from" that transaction. In this connection, we found Mr. Hall to be a credible witness at trial.  In contrast, based on our observation of Mr. Scott's demeanor during his testimony, we generally did not find him to be

credible. Where the testimony of Mr. Hall and Mr. Scott was conflicting, we relied on Mr. Hall's testimony. Mr. Hall's testimony establishes that Mr. Harrison, Mr. Hall, Mr. Scott, Mr. Carter, MSSTA, and AST tentatively agreed that AST would pay approximately $800,000 for MSSTA's assets, $600,000 of which AST would pay directly to MSSTA and $200,000 of which AST was willing to reflect, along with an additional amount, as a payment to be made by AST directly to Mr. Carter under an agreement by him to consult and not to compete with AST. They also tentatively agreed that Mr. Carter and the Scotts would receive from MSSTA liquidating distributions, based on their respective stock ownership of MSSTA, of the $600,000 balance of the $800,000 that AST was willing to pay MSSTA for its assets and that the Scotts would use money that they would receive from MSSTA in such liquidating distributions to assist them in purchasing stock in AST.

During the negotiations among Mr. Harrison, Mr. Hall, and Mr. Scott, Mr. Scott asked Mr. Hall what the tax consequences would be to MSSTA and the Scotts as a result of the foregoing tentative agreements that they had reached about the MSSTA transaction. Mr. Hall responded that (1) MSSTA's tax liability would be approximately $100,000 if it reported the $600,000 that AST had tentatively agreed to transfer to it as the amount realized from the sale of its assets; (2) there would be no tax consequences to MSSTA as a result of AST's payment directly to

Mr. Carter under a consulting agreement of $200,000 of the total $800,000 that AST was willing to pay for MSSTA's assets; and (3) based on the tax law relating to capital gains, the Scotts would owe tax on the capital gains that they would realize when MSSTA made liquidating distributions to them as 48-percent stockholders of MSSTA of approximately $300,000, which tax would be equal to about one-third of such gains.  Because of that capital gains tax that the Scotts would owe, they would not have sufficient cash from the MSSTA transaction to purchase the entire 33-percent stock interest in AST which they wanted to acquire and to which Mr. Harrison, Mr. Hall, and AST had tentatively agreed, and they would have to make other arrangements to buy that stock interest, such as guaranteeing the loan that AST would have to obtain in order to finance in part its purchase of MSSTA's assets.  Mr. Hall cautioned Mr. Scott that, because Mr. Hall was not familiar with either MSSTA's or the Scotts' tax situation, Mr. Scott should consult a tax adviser to review the MSSTA transaction and to advise them about the tax consequences to MSSTA and the Scotts as a result of that transaction.

Mr. Scott told Mr. Hall that he did not intend to pay any taxes as a result of the MSSTA transaction.  To accommodate Mr. Scott, Mr. Harrison and Mr. Hall told Mr. Scott that the form of the MSSTA transaction could be changed to the following:  AST would transfer directly to MSSTA $300,000, instead of $600,000,

for MSSTA's assets; Mr. Carter would receive that $300,000 from MSSTA in redemption of his MSSTA stock; and the Scotts would acquire a 21-percent stock interest in AST for a nominal cash amount. Mr. Hall indicated to Mr. Scott that, under the foregoing form of the MSSTA transaction, MSSTA and the Scotts could take the following return positions: (1) MSSTA would report the $300,000 that it received directly from AST as the amount realized from the sale of MSSTA's assets, and (2) the Scotts would not report any income because there would be no liquidating distributions to them by MSSTA. Mr. Hall further advised Mr. Scott that, provided that the foregoing return positions were accepted by the Service, (1) MSSTA's tax liability would be approximately $10,000, and (2) the Scotts would not owe any tax. Mr. Hall cautioned Mr. Scott that the Service could decide not to accept those return positions of MSSTA and the Scotts because the Scotts would be paying only a nominal cash amount for a 21-percent stock interest in AST and would not be reporting any income attributable to liquidating distributions by MSSTA to them. Nonetheless, Mr. Scott, acting on behalf of MSSTA, Ms. Scott, Mr. Carter, and himself, and Mr. Harrison and Mr. Hall, acting on behalf of AST and themselves, decided to take that tax risk and agreed, inter alia, on the following form of the MSSTA transaction: AST would transfer only $300,000 directly to MSSTA for its assets; Mr. Carter would receive that amount from MSSTA in

redemption of his MSSTA stock; and the Scotts would pay AST only a nominal cash amount to acquire a 21-percent stock interest in that company.

As for petitioners' contention regarding Mr. Scott's and MSSTA's reliance on the advice of Mr. Bosworth, we have found that Mr. Bosworth did not hold himself out to be an expert in tax matters. In fact, Mr. Bosworth agreed to represent MSSTA and Mr. Scott in the MSSTA transaction only after Mr. Scott informed him that Mr. Scott had retained Mr. Hrynik, a C.P.A., to advise on tax matters. On the instant record, we reject petitioners' contention regarding Mr. Scott's and MSSTA's reliance on Mr. Bosworth for tax advice regarding the MSSTA transaction.

As for petitioners' assertion regarding Mr. Scott's and MSSTA's reliance on Mr. Hrynik for tax advice with respect to the MSSTA transaction, we note initially that we found Mr. Hrynik to be a credible witness at trial. Where the testimony of Mr. Hrynik and Mr. Scott was conflicting, we relied on Mr. Hrynik's testimony. Mr. Hrynik testified that he did not consider his advice that MSSTA's tax liability would not exceed $10,000 to constitute his opinion as to whether the $300,000 purchase price, which the Bosworth letter represented to him was the amount to be reported to all tax authorities as the purchase price for MSSTA's assets, would be sustained if MSSTA's return were audited by the Service. Mr. Hrynik's advice about MSSTA's tax liability as a

result of the MSSTA transaction was based on the representations in Mr. Bosworth's letter regarding that $300,000 purchase price. Similarly, Mr. Hrynik's opinion about MSSTA's solvency after the MSSTA transaction was based on the representations in the Bosworth letter and Mr. Hrynik's review of the asset purchase agreement and the stock redemption agreement between MSSTA and Mr. Carter. In rendering that solvency opinion, Mr. Hrynik was not aware that the parties to the MSSTA transaction had agreed that the Scotts could buy a specified number of shares of AST stock for a nominal cash amount. On the instant record, we reject petitioners' contention regarding Mr. Scott's and MSSTA's reliance on Mr. Hrynik's opinion that MSSTA's tax liability would not exceed $10,000 and that MSSTA would remain solvent after the MSSTA transaction. In fact, Mr. Hrynik cautioned Mr. Scott that, because the transactions reflected in the MSSTA transaction draft documents that Mr. Scott gave him were to occur simultaneously and in no particular order, the Service might treat those transactions as one transaction for tax purposes. In response, Mr. Scott told Mr. Hrynik not to spend very much time reviewing the tax consequences of the MSSTA transaction because Mr. Scott had consulted with AST's accountants and Mr. Scott believed that he understood the tax consequences of that transaction.

Based on the entire record before us, we find that the transfer by MSSTA to Mr. Scott of $104,580 of the amount that

MSSTA realized from the sale of its assets to AST (i.e., a 10.5-percent stock interest in AST and $9,508 in cash) was made by MSSTA, the transferor, to Mr. Scott, the transferee, with the intent to hinder, delay, or defraud the Service within the meaning of the Colorado fraudulent conveyance statute.[19]  We further find that Mr. Scott is liable as a transferee of property of MSSTA for MSSTA's unpaid tax liability to the extent of $104,580.

We shall now address respondent's position regarding Ms. Scott.  In support of respondent's contention that Ms. Scott, as a transferee of property of MSSTA, is liable under the Colorado fraudulent conveyance statute for MSSTA's unpaid tax liability to the extent of $95,072, respondent asserts:

> Mrs. Scott could not even recite what kind of consideration she paid for the AST stock that constitutes the property she received from MSSTA.  She asked no questions at all during the closing of the transactions.  Moreover, to the extent that she stands as a nominee of Mr. Scott, his conduct should be imputed to her.
>
> Regardless of her head-in-the-sand approach, Mrs. Scott's receipt of MSSTA's assets [was] part of a series of transactions that left MSSTA insolvent.  This badge of fraud, along with the indifference to the transactions, support a finding of liability as to Mrs. Scott * * *.

On the instant record, we find that respondent has failed to establish that Ms. Scott knew of, or participated in, the intent of MSSTA to hinder, delay, or defraud the Service of MSSTA's unpaid tax liability within the meaning of the Colorado fraudulent conveyance statute.  At some undisclosed time prior to September

[19]  We have considered all of the arguments of petitioners that are not addressed herein, and we find them to be without merit.

14, 1989, the closing date, Ms. Scott learned about the MSSTA transaction from Mr. Scott.  She understood from him that, after the MSSTA transaction, Mr. Scott would own an aggregate stock interest in AST, a corporation that was larger than MSSTA, which was smaller than his stock interest in MSSTA before that transaction.  Although Ms. Scott was present at certain meetings between Mr. Bosworth and Mr. Scott shortly before the closing of the MSSTA transaction and reviewed certain documents relating to that transaction, she did not participate in the discussions relating to that transaction.  In addition, while she was present at the closing of the MSSTA transaction, Ms. Scott was not aware of the purchase price that she was paying for the AST stock which she was acquiring as part of the MSSTA transaction.  Ms. Scott agreed to the MSSTA transaction because she relied on and accepted Mr. Scott's recommendation to her that it was desirable to effect that transaction.[20]

Based on our examination of the entire record in this case, we find that respondent has failed to prove that Ms. Scott, as a transferee of property of MSSTA, is liable under the Colorado fraudulent conveyance statute for MSSTA's unpaid tax liability to

[20]  With respect to respondent's suggestion that Ms. Scott "stands as a nominee of Mr. Scott, [and therefore] his conduct should be imputed to her", such a suggestion is a new matter, Rule 142(a), and, in any event, on the record before us, we find that respondent has failed to establish that Ms. Scott acted as a nominee of Mr. Scott with respect to the MSSTA transaction.

the extent of $95,072.  Accordingly, we shall not sustain respondent's determinations against Ms. Scott.

Having found Mr. Scott liable as a transferee for MSSTA's unpaid tax liability to the extent of $104,580, we shall consider respondent's contention that, under Colo. Rev. Stat. sec. 5-12-102 (1998) (Colorado statutory interest provision), Mr. Scott is liable for interest from March 15, 1990, viz., the date on which MSSTA became liable for MSSTA's unpaid tax liability, to January 10, 1995, viz., the date on which respondent issued the notice to Mr. Scott.[21]

The Colorado statutory interest provision states in pertinent part:

> 5-12-102.  Statutory interest. (1)  Except as provided in section 13-21-101, C.R.S., when there is no agreement as to the rate thereof, creditors shall receive interest as follows:
>
> (a) When money or property has been wrongfully withheld, interest shall be an amount which fully recognizes the gain or benefit realized by the person withholding such money or property from the date of wrongful withholding to the date of payment or to the date judgment is entered, whichever first occurs; or, at the election of the claimant,
>
> (b) Interest shall be at the rate of eight percent per annum compounded annually for all moneys or the value of all property after they are wrongfully withheld or after they become due to the date of payment or to the date judgment is entered, whichever first occurs.

---

[21]  See supra note 2.

Respondent contends that, because the transfer by MSSTA to Mr. Scott of $104,580 of the amount that MSSTA realized from the sale of its assets is a transfer subject to the Colorado fraudulent conveyance statute, that amount of property was wrongfully withheld within the meaning of the Colorado statutory interest provision. Consequently, according to respondent, Mr. Scott is liable for interest under that provision for the period March 15, 1990, to January 10, 1995.[22] Petitioners counter that Mr. Scott is not liable under the Colorado statutory interest provision for interest during that period because no assets of MSSTA were wrongfully withheld. On the instant record, we agree with respondent.

Although the term "wrongfully withheld" is not defined by the Colorado statutory interest provision, Colorado courts have consistently held that that section is to be broadly construed. See Mesa Sand & Gravel Co. v. Landfill, Inc., 776 P.2d 362, 364-365 (Colo. 1989) (en banc); see also Isbill Associates, Inc. v. City and County of Denver, 666 P.2d 1117, 1121 (Colo. App. 1983).

---

[22] Par. 5 of the closing agreement stated:

> Carter, Scott, AST, MSSTA and the Internal Revenue Service agree that in the event one or more of these parties (Carter, Scott, and/or AST) is found to be personally liable as a transferee, the liability is $164,981 plus interest from March 15, 1990.

Respondent stipulated that the foregoing does not estop petitioners from arguing that they are not liable for interest from Mar. 15, 1990, to Jan. 10, 1995.

In Mesa Sand & Gravel Co. v. Landfill, Inc., supra at 364, the Colorado Supreme Court stated:

> The purpose of section 5-12-102 [of the Colorado Revised Statutes] is to discourage a person responsible for payment of a claim to stall and delay payment until judgment or settlement. Section 5-12-102 recognizes the time value of money. It represents a legislative determination that persons suffer a loss when they are deprived of property to which they are legally entitled. [Citations omitted.]

According to the U.S. Court of Appeals for the Tenth Circuit, to which an appeal in this case would normally lie, "a 'wrongful withholding' [under the Colorado statutory interest provision] need not involve actual fraud, or indeed be tortious in nature". Stansbury v. Commissioner, 102 F.3d 1088, 1093 (10th Cir. 1996), affg. 104 T.C. 486 (1995). That Court of Appeals found a wrongful withholding under the Colorado statutory interest provision where the Colorado fraudulent conveyance statute applied to a transfer of property. Id.

We have found that MSSTA's transfer to Mr. Scott of $104,580 of the amount that it realized from the sale of its assets to AST is subject to the Colorado fraudulent conveyance statute. We further find that that amount was wrongfully withheld within the meaning of the Colorado statutory interest provision, see Stansbury v. Commissioner, supra, and that Mr. Scott is liable for interest under the Colorado statutory interest provision from March 15, 1990, to January 10, 1995.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.